Kirkpatrick, C. J.
This is a case arising on the acts of Assembly, commonly called the confiscation acts, passed in the time of the revolutionary war.
The question brought up upon the demurrer, is Avhether, upon the forfeiture of the husband’s lands under these acts, the wife’s dower also becomes forfeited.
It is not a new question. It has been agitated and settled in this court, in the case, I think, of Stockton and Slack, many years ago. And so satisfactory has [f] that case been, *333 that although there have been very many actions of dower instituted since that [560] time, both in this court, and in the Court of Chancery, under similar circumstances, yet its principles, so far as I am informed, have never been doubted, or in any way called into review. As, however, counsel have thought proper now to bring it up again, and to make it the subject of laborious argument, it may be well enough to look into it.
It is not pretended that the confiscation acts contain any express words, creating the forfeiture of the wife’s dower. Neither is it pretended that the forfeiture of the husband’s lands, necessarily carries with it the forfeiture of the wife’s dower, merely because it is created by act of Assembly. The statutes of premuniré forfeited the lands as well as the goods; yet this forfeiture never affected the dower of the wife.
But it is said that by the common law, as well as by statute, at the time of this transaction, if a man were attainted of treason, and thereby forfeited his lands, his wife’s dower also became forfeited; and that Daniel Cozens, the husband of the demandant, by the inquisition and judgment against him set forth in the plea, did become attainted of treason, that being so attainted, he forfeited his lands, and that that forfeiture carries with it the forfeiture of the dower of Elizabeth Cozens, his wife; and if the fact be true, the law unquestionably follows.
Eet us examine it.
Attainder at the common law, is the consequence of a judgment in treason or felony, and that whether the judgment be of death of conviction, or of outlawry on a quinto exaetus returned. That there was a judgment of death on conviction in this case, is not pretended; Daniel Cozens was neither indicted, nor tried, nor convicted. Neither is it pretended that there was a judgment of outlawry on a quinto exaetus [*] returned, strictly speaking; for besides, that such proceeding has never been in use in this State, there being *334 no indictment against Daniel Cozens; there could be no capias or exigi facias upon which to ground a judgment of outlawry against him.
' But still it is said, tliat though there has not been judgment of outlawry, strictly speaking, according to the course of the common law, yet there have been proceedings in the nature of an outlawry against the said Daniel Cozens; that he thereby became attainted of treason on a sound construction of these acts, and that all the consequences of attainder necessarily ensued.
Let us see how this stands. It is manifest that these acts, beirig in their nature highly penal, must be construed [561] strictly. We cannot, by any fanciful reasoning from analogy, say that a man has had judgment against him, as in case of outlawry for treason; that he has thereby become attainted, and thus subject his estate to all the consequences of attainder, when the law says no such thing.
The first act to be taken notice of in this inquiry, is the act to punish traitors and disaffected persons, passed October 4, 1776. This act defines what shall be treason against the State, and also creates sundry other offenses punishable by fine and imprisonment. I mention this act principally because it is referred to in the confiscation acts, and because its date is important, and not because it has any immediate bearing upon this subject.
The next act is the act of free-and general pardon, passed June 5, 1777. This act recites that divers subjects of this State had been seduced from their allegiance, joined the army of the king of Great Britain, and been guilty of other treasonable practices, and then offers to all such who shall appear and take the oaths therein prescribed, within a limited time, a free pardon of all offenses against the treason act, whether [*] treasons or misdemeanors theretofore done or committed. Then it goes on and forfeits the personal estates *335 of such of the said offenders as should not appear and take the oaths, and appoints commissioners to take charge of them.
The next in order, is that of April 8, 1778. This act recites, that many of the offenders mentioned in the act of free and general pardon last recited, had neglected to avail themselves of its benefits, and then by its first section, directs inquisitions to be taken against them, prescribing the manner and form of taking such inquisitions, the proceedings and judgments to be had and entered thereupon, and the effect of such judgments. This section relates to those only who had offended between the 4th of October, 1776, the date of the treason act, and the 5th June, 1777, the date of the act of free and general pardon. But, inasmuch as many persons had offended after the date of the act of 5th June, 1777, and before that of April 8th, 1778, which we are now considering; and inasmuch as many might offend in like manner thereafter, therefore, in the 7th section it goes on and directs, that inquisitions should be taken out against all such also, in like manner as against those described in the first section. And it is in pursuance of this seventh section of this act, that the inquisition was taken and the judgment entered in this case. These inquisitions were directed to be taken before justices of the peace, and by them to be returned to the Courts of Common Pleas; then certain proclamations were to be made, and public [562] notices given; and if the defendant, ox some pexson fox him, did not appear and traverse, then judgment was to be entered in favor of the State. The words of this section, (being the very section upon which these proceedings were had,) as to the entry of these judgments, and the effect of them are very important. They are these:
“And if upon return of the said inquisition in manner [*] aforesaid, judgment shall be entered thereon in favor of the State, all and singular the goods and chattels, rights and *336 credits and personal estate whatsover of the person against whom judgment is so entered, shall be, and they are hereby declared to be forfeited to and for the use of the State.”
Now, in all these confiscation acts, so far as I have gone, there is not a single word about treason or traitors, not a word about judgment of death or of outlawry for treason upon these inquisitions, not a word • that can' give the least countenance to the idea that these proceedings were intended to have the effect of an outlawry, or that the offender thereby became attainted. The forfeiture is the single object; the forfeiture, and that of the personal estate only, is the whole effect of this whole proceeding. The acts speak of nothing else, they have no allusion to any thing else. They have not yet touched even the land. Here then is inquisition found and final judgment entered thereupon for the State, and yet the lands of the husband himself are not forfeited, much less the dower of the wife. Taking our stand here, we see distinctly' the whole effect of this proceeding. To talk of its amounting to an attainder of treason upon an outlawry, and of the forfeiture in question as being consequent thereupon, is talking without book. And that the Legislature itself had no such view, is manifest from this, that long after this time, to wit, in December, 1778, they passed another act, which by its first section declares the lands of those against whom inquisitions had been found, and final judgment entered as aforesaid, to be forfeited to, and vested in the State of New Jersey forever. And it is by virtue of this section of this act alone, and not by any magic in the inquisition and judgment, that the lands in question became forfeited. If the lands had been forfeited before, this act would have been perfectly nugatory.
[.*] It is true indeed, that some of the offenses for which these inquisitions were taken, and judgments entered, were treasons, strictly speaking, within the description of the trea *337 son act. But even if they were all such, it is nothing to the purpose. It is neither the commission nor the conviction of treason, that creates the forfeiture at common law, it is the attainder consequent upon the judgment of death or outlawry, [563] or other judgment operating directly upon the person. And therefore, if a traitor be convicted of treason by verdict of a jury, or by confession in open court, and die before judgment, it works no forfeiture of lands, for he never was attained.
The second section of the act last mentioned, of December 11, 1778, indeed, declares certain offenders therein described, to be guilty of high treason against the State, and then proceeds, and says, “that on conviction thereof by inquisition found, and final judgment thereon entered in favor of the State, such conviction shall amount to a full and absolute forfeiture of such person’s estate, both real and personal,” &c., “ provided always, that such conviction shall not extend to affect the person of any such offender, but shall operate against his or her estate only.”
This is the section upon which the counsel seemed principally to rest. Now give to the words of this act the utmost possible extent, and there can be no attainder; for suppose the inquisition and judgment actually to have wrought a conviction, upon which judgment of death might have been rendered against the offender, yet as such judgment was never rendered, there could be no attainder. But the Legislature have not left this to the subtle reasoning of lawyers. They have expressly said that “ the conviction ” spoken of “ shall not affect the person; ” now does an attainder affect the person? “nay, it is altogether personal.” It is a mark, a note of infamy set upon the traitor, which puts him out of the protection of the law, by which he becomes attinclus, stained or [*] blacked. And yet it is contended that a pi'oceeding which cannot affect the person, may work an attainder ! But even if this were so, it will be found on inspection, *338 that this section, so much relied upon, has no relation to that class of offenders of which Daniel Cozens was one. It relates only to those who had offended between the 19 th of April, 1775, the day of the Battle of Lexington, and the 4th of October, 1776, the date of the Treason Act. Whatever conceits, therefore, may have been raised upon the vagueness of its phraseology, and it is certainly vague enough, it can have no effect in this case.
The plea, therefore, pleaded in bar to this action, is, in my opinion, altogether insufficient.
There is a second ground of argument, founded upon the death of John Long, one of the original defendants, pending the suit.
The land out of which the dower is claimed, is the land of Alice Long, the wife, the surviving defendant. The cause of action, therefore, (to use the words of the [564] act of Assembly on that subject,) survives against her after the death of her husband; and this being so there can be no abatement of the suit under our law. But then there ought to have been a suggestion of the death upon the record, by the demandant, before she proceeded further. The demurrer, therefore, was in'egularly filed. The surviving defendant, however, has not availed herself of this irregularity, but has voluntarily joined in the demurrer, suggesting the death herself in her joinder. It appears to me, therefore, that no advantage can be taken now. The suggestion of the death serves only to apprise the opposite party with whom he has to contend, and the court, for or against whom the judgment is to be rendered. These ends are sufficiently answered by what appears upon this record.
Upon the whole, therefore, I am clearly of opinion, [*] that judgment must be rendered for the demandant upon the demurrer.
Rossell, J.
He had prepared an opinion at considerable length, but ,as the Chief Justice had gone so fully into the *339 subject, he did not think it of importance sufficient to take up the time of the court to deliver it. He should, therefore, say no more than that, in his opinion, the demandant was entitled to judgment.
Pennington, J.
The first point taken by the counsel for the tenant is, that the action has abated by the death of one of the tenants. That this is so common at law, is not denied. But our act of Assembly, Pat. 1J¡,6, gives a different rule, in the case of two or more plaintiffs or defendants. But as this is a real action, in which the parties are denominated demandants and tenants, it is said not to apply. I am, however, of opinion, that it comes within the substantia] meaning and spirit of the act; and, therefore, that the parties are properly before the court. This preliminary question being disposed of, leads to the consideration of the main subject of controversy.
To a count in dower, the tenant pleads in bar, an inquisition under the confication acts of this State, passed in the Revolutionary War, found against the husband, and judgment by default rendered therein. To this plea, the demand-ant, demurs, and there is joinder in demurrer. It is not pretended that these confiscation acts of themselves, forfeit the dower of the widow; but that the inquisition taken under them furnishes evidence of a fact, which at common law, bars the widow of her dower. The argument is, that at common law, the widow of a traitor cannot demand her dower; that the inquisition found against the husband of the demandant, and judgment rendered thereon, establishes this fact, that he was a traitor, and therefore [565] that the widow is barred her dower. The law is laid down too general by the counsel [*] for the tenant. Although the commission of the crime is the cause of the forfeiture, yet that alone is not sufficient; the offender must be attainted, judgment must be rendered against him. It is true, that judgment of outlawry has the same effect; but this is the same *340 thing. Judgment of odtlawry is an attainder in law, Lit. Ten., section 7J¡!7. An outlawry in treason amounts to an attainder, ^, Blae. Com. 8Up; an attainder is defined to be the stain or corruption of blood of a criminal capitally condemned. It is the immediate inseparable consequence on the pronouncing the sentence of death. The offender is then called attaint, stained or blackened. There is this difference between forfeiture of lands, and that of goods and chattels: lands are forfeited upon attainder, and not before; goods and chattels by conviction only. Ip Blae. Com. 380. It is not pretended that the inquisition found against the husband by default, is an actual conviction of treason and judgment thereon; but the learned counsel for the tenant contended, that the inquisition is an outlawry, and of consequence, works a forfeiture. In this I apprehend they are wholly mistaken, both in form and substance. One great and all important difference is, that an outlawry is a proceeding against the person of the offender; the inquisition is a proceeding against his estate. This is evident not only from the general scope and design of the confiscation acts under which it is taken, but from an express provision in the acts, to wit, “ that such conviction shall not, in any instance, extend to affect the person of the offender, but shall operate against his or her estate only.” Wilson N. J. Laws, 68. An outlawry must be preceded by, and founded on an indictment of the grand jury, legally impanneled by a court of criminal jurisdiction. The inquisition is taken before a single magistrate, and returned to the Common Pleas, a court of civil jurisdiction only; the judgment rendered is a judgment against the estate of the offender. The offender might [*] have been present in court at the time of pronouncing judgment, with perfect safety to his person. In respect to the confiscation acts, his person was as safe as though they had never existed. By considering these acts made solely with a view to confiscation, we rid *341 them of the absurdity of declaring a man guilty of high treason, and in the same section protecting his person from punishment. Certainly no man was ever indicted under these acts for treason; if he had been, he might have pleaded the provisions in the acts themselves in bar. A judgment of forfeiture, under these acts, bears no resemblance [566] to a judgment of outlawry for treason, which corrupts the blood of the offender, puts him out of the protection of the law, and until the humanity of the court instituted a new rule in his favor, rendered him liable to be knocked on the head like a wolf, and even after that, left him subject to be apprehended, and by warrant, executed as a traitor. But the inquisition, even if considered as a proceeding against the person of the offender, does not find a fact sufficient to constitute treason; it finds this fact only, that the husband joined the army of the king of Great Britain. For I take no notice of the words, “ and otherwise offended against the form of his allegiance to the said State,” as forming no specific charge. The time of his joining the British army is not mentioned; for all that appears, he might have been a resident in another colony, and joined the British army the next day after the battle of Lexington. I think that I may venture to say, that no man was ever indicted and convicted of treason in this State, for any act done anterior to the passing the Treason Act in October, 1776; yet the estates of refugees were made liable to confiscation for joining the British army in April, 1777.
"We are told by the learned counsel for the tenant, that the confiscation acts, and the treason act, were made in pari materia, and must be taken together; a cotemporanoous proceeding will show the relation [*] they were considered as bearing to each other in the time of the war. A. citizen of Flew Jersey, after the passing of the treason act, fled to the enemy; an inquisition was found against him, and his real and personal property confiscated; afterwards he was taken *342 prisoner, indicted for high treason, tried and acquitted, and at this moment enjoys in quiet the privileges of a citizen of the State. It is worthy of observation, that this prosecution, was conducted by a man whose legal learning,and professional skill was inferior to no man in the State, and who was perfectly versed in the criminal law of the day.[1] Again, we are told, that our confiscation acts are copied from the 20 Geo. II., forfeiting the estates of the Scotch rebels. Not so; this English statute calls for the actual records of the attainder of the offenders, as the sole authority for taking possession of their property and estates; and requires no inquisition. We perceive in this act, a strict adherence to the principlés of the common law, making the judgment of attaint, the ground of forfeiture.
I admit, that in very ancient times, a doctrine was entertained, that if a rebel was slain in battle, or taken [567] and hanged by martial law, it created a forfeiture of his estate, without an attainder. There is also a dictum of Brown, Justice, in the case of Hales v. Pettit, in the early part of the reign of Elizabeth, Plowden. 262, “that in 8 Edward III, a woman brought a writ of dower, and the tenant said that her husband went into Scotland and adhered to the king’s enemies, and came into the realm with the king’s enemies, and afterwards died in Scotland; and it seems a good bar by averment, for other law could not be had against him.” But in this very case, Dyer, Justice, denied this to be law, and said that the case was not so adjudged in 8 Edward III. I have not the year books, and cannot say which of the learned judges were right, but the law has been settled otherwise for two hundred years. Coke Lit. 18; 1 Hale’s P. C. [*] 343 — 4; 4 Bloc. Com. 380. Hence the practice of statute attainders, to enable the crown to seize on the estates of traitors and rebels. These parliamentary attainders are said to be imitations of attainders at *343 common law, Hob. ; they amount to judgment of treason, and create a forfeiture.
The only ground on which the tenant can succeed is, that our confiscation acts, together with the inquisition, amount to a statute attainder, which is not pretended, nor can it be with the least shadow of reason.
For the foregoing reasons, I am clearly of opinion, that the demandant is entitled to judgment.
Judgment for the demandant.

 The late Judge Paterson, then Attorney-General.